## STEIN *v.* BIENVILLE WATER-SUPPLY CO.

*(Circuit Court, S. D. Alabama.* March 7, 1888.)

1. CONSTITUTIONAL LAW—MONOPOLIES AND PRIVILEGES—WATER COMPANIES.

The city of Mobile, having acquired by purchase or forfeiture the franchises and plants of two water companies chartered, respectively, in 1820 and 1837, entered into a contract in 1840 with one S., whereby, in consideration of certain covenants contained in the agreement, he was granted "the sole privilege of supplying the city of Mobile with water from the Three-Mile creek for twenty years" from the date of the contract. He was also invested with whatever rights and privileges the city had derived from the defunct companies. The creek referred to was the most accessible source for the city's water supply, and the city had, when the contract was made, certain water-works at that point, which it had acquired from one of the old corporations. The company of 1820 was chartered for 40 years, and for the purpose, clearly expressed in the act, of conducting water "from Three-Mile creek" for use in Mobile. The company of 1837 was incorporated upon the repeal of the charter of 1820, and was invested for about 20 years with the exclusive franchises conferred by that charter. The city then bought out the corporation of 1837, and made the contract with S., which the legislature confirmed in 1841, vesting in S. the privileges under the acts of 1820 and 1837, so far as consistent with the contract of 1840. *Held*, that the exclusive privilege of supplying the city with water was confined to water taken from the Three-Mile creek, and that the grant in 1883 to another corporation of the exclusive right of conducting and bringing water into the city from any point other than Three-Mile creek did not legally "impair" the obligation of the contract of 1840.[1]

2. SAME—POLICE POWERS.

In granting an exclusive franchise to supply water to one of its cities and its inhabitants, the legislature of the state does not part with the police power and duty of protecting the public health.[1]

3. WATER COMPANIES—CHARTERS AND FRANCHISES—CONSTRUCTION.

The preamble of a statute incorporating a water company, recited, among other things, "that certain individuals have agreed to associate themselves together for the purpose of conducting a supply of water from a creek called 'Three-Mile Creek,' for the use of * * * the city of Mobile." It then provided that the said corporation "shall have and enjoy the exclusive right and privilege of conducting and bringing water for the supply of said city for the space of 40 years," provided the water was brought from said creek within three years from the date of the act, and in the manner therein prescribed. *Held*, that the exclusive privilege of supplying water to the city was confined to water drawn from the Three-Mile creek.

4. SAME—CONSTITUTIONAL LAW—IMPAIRING OBLIGATION OF CONTRACT.

Where the exclusive right of supplying a city with water is confined to water drawn from a certain source, the right of using the streets free of charge for the purpose of laying pipes, etc., for the conveyance of such water, granted in the enabling statute, is not impaired by a subsequent grant of eminent domain to another company drawing its supply from a different source.

5. SAME—DURATION OF FRANCHISE.

A contract between the city of Mobile and one S. provided that S., his executors or assigns, should have the exclusive right for 20 years of supplying the city with water drawn from a certain source, and, until the city should redeem the plant, S. should have quiet possession of it, without let or hinderance from the city or from any one claiming under it. *Held*, that the franchise did not expire with the 20 years, but that it remained a monopoly in the hands of S.'s executor, (S. having died,) until the city redeemed the plant as provided in the contract.

[1] See note at end of case.

In Equity.    On demurrer to bill.

This bill was filed April 25, 1887, seeking to establish a monopoly in the supplying of water to the city of Mobile, under a contract of December 26, 1840, between the city and complainant's testator, confirmed by act of the Alabama legislature of January 7, 1841; and, as a part of the relief, the bill prayed an injunction upon the defendant from constructing its new, improved, and much larger water-works.    An application was made for an injunction *pendente lite*, which was refused by PARDEE, J., June 6, 1887, leave being granted, however, to make application anew therefor to HARLAN, J.    The application to HARLAN, J., was likewise refused December 2, 1887, as heretofore reported in 32 Fed. Rep. 876, where additional facts bearing on the case are stated.    Demurrers 6, 7, and 8 referred to in the opinion relate to a grant of monopoly affecting the public health, and demurrers 9 and 10 assert that the remedy at law is adequate.

*L. H. Faith*, for complainant.

*P. & T. A. Hamilton*, and *Overall & Bestor*, for defendant.

TOULMIN, J., (*after stating the facts, as above.*)    This bill of complaint is brought by the executor of Albert Stein, deceased, as the proprietor of what is known as the "Stein Water-Works," in Mobile, to enjoin the Bienville Water-Supply Company from laying its pipes in or through the streets of the city of Mobile for the purpose of furnishing water through the same to the inhabitants of said city, and from conducting water into said city for the supply of its inhabitants for domestic and municipal purposes, on the claim of an exclusive right in the complainant to furnish that supply.    The defendant is a corporation of the state of Alabama, under an act of incorporation approved February 19, 1883, and amended February 4, 1885.    By its act of incorporation the defendant is charged with the duty of introducing into the city of Mobile such supply of pure water as the domestic, sanitary, and municipal wants thereof may require.    For this purpose power is given to it to acquire lands, and use the public roads and streets of the said city wherein to lay its pipes.    It is also authorized to make and maintain proper canals, ditches, pipes, and aqueducts from any point in the county of Mobile, within 20 miles of the city of Mobile, and there is given to it the exclusive right of conducting and bringing water into said city from any point other than Three-Mile creek in said county, for the period of 20 years from the time when water so brought by it is ready for distribution within the limits of said city.    The duty is imposed on the corporation of beginning the construction of its works, and of having them ready for distribution of water to the citizens of said city within a time limited by the act of incorporation.    The claim of complainant is that he has the exclusive right to supply the city of Mobile with water from all sources, and that any attempt by the defendant to introduce water into said city from any source whatever is an infringement of his rights, which should be enjoined.    He asserts that his rights are interfered with by the defendant in laying down pipes and mains for the purpose of

conducting water into said city. But it is not averred that the defendant proposes to conduct and bring water from the Three-Mile creek. To entitle the complainant to the relief prayed for in the bill he must show in himself a clear and indisputable right for the exclusive supply of water by him to the city of Mobile and its inhabitants from any and all sources. His right rests on a contract made by his testator, Albert Stein, with the city of Mobile on December 26, 1840, as confirmed by the act of the general assembly of Alabama approved January 7, 1841.

It seems from the legislation on the subject that before that time sundry attempts had been made to bring water into the city from the Three-Mile creek, by means of corporations chartered for that purpose, but it does not appear that at the time of the agreement with Stein any of said corporations were in existence, or had been organized. By act of the general assembly of December 24, 1824, the charter of the first "aqueduct company," which had been authorized by act of December 20, 1820, was declared to be null and void by reason of the corporation not having complied with the conditions of its charter, and whatever privileges it had were declared to be vested in the city corporation. The period of its privileges was to be for 40 years, provided that before the expiration of three years from the date of its charter it had caused to be conducted the water from the said Three-Mile creek to the city of Mobile, in the manner prescribed in the act of incorporation. The act further provided that after the expiration of the said term of 40 years the waterworks of the said "aqueduct company" should become the property of the said city for the use of the inhabitants thereof. These 40 years of privilege expired in December, 1860. It appears that in December, 1836, the city of Mobile, having become the owner of the property connected with the water system, contracted with one Hitchcock to lease the same to him for a term of 20 years, and he was thereafter to supply water to the city. By act of December 25, 1837, the contract between Hitchcock and the city was confirmed, and another aqueduct company was authorized to be organized, and the Hitchcock interest merged in it. This corporation was to take Hitchcock's place. It was to have the rights and privileges of the former aqueduct company, and to continue a corporation after its organization with these rights until the 1st of December, 1856, and until they shall have been purchased out by the city of Mobile, in conformity to the contract with said Hitchcock of December 1, 1836. Whether this company ever organized or not does not appear, but it does appear that the city of Mobile had become the owner of the water-works before the contract was made with Stein in 1840. So it seems that at the time the contract with Stein was made this aqueduct company of 1837 had in some manner been purchased out by the city; the charter of the aqueduct company under the act of 1820 had been vacated and annulled; that of the original term of privileges or monopoly, (which was 40 years,) only 20 years still remained; that the privileges of the charter of 1820 were revived to the aqueduct company by the act of 1837 for the term of 20 years, and until they shall have been purchased out by the city; that when the contract with Stein was

made, the property of the aqueduct company had all been acquired by
the city, and that all the privileges of that company had at that time
ceased.    The city, then, was in a position to contract with Stein for the
supply of its inhabitants with water.    It had, however, no power to
contract with him for the exclusive right of supplying the city with
water without the sovereign authority of the state.    *Railway Co.* v. *Rail-
way Co.*, 79 Ala. 465, and numerous authorities cited therein; *Gas-Light
Co.* v. *City of Saginaw*, 28 Fed. Rep. 534.    It does not appear that it had
such authority.    But in December, 1840, the agreement with Stein was
made, by which was granted to him "the sole privilege of supplying the
city of Mobile with water from the Three-Mile creek, for twenty years
from the date of the agreement," and this agreement was fully confirmed
by act of the general assembly of January 7, 1841.

The claim asserted by complainant, as before said, is that he has the
exclusive right to supply the city of Mobile and its inhabitants with
water from any and all sources, and he bases this claim on the agreement
of December 26, 1840, and the act confirmatory thereof of January 7,
1841.    "The principle is that no franchise which is granted by the state
is ever construed to be exclusive, whether it be in the nature of a con-
tract or not, unless it be so declared in clear terms, or be necessarily im-
plied," or "unless the terms of the grant render such construction im-
perative," as some writers express it..    *Railway Co.* v. *Railway Co.*, 79
Ala. 472; 1 High, Inj. § 902; Cooley, Const. Lim. 489, marg. p. 395.
"No rule is better settled than that charters of incorporation are to be
construed strictly against the corporators.    The just presumption in every
such case is that the state has granted in express terms all that it designed
to grant at all.    In the construction of a charter, to be in doubt is to be
resolved, and every resolution which springs from doubt is against the
corporation."    *Railroad Co.* v. *Commissioners*, 21 Pa. St. 22; *Bridge Co.*
v. *Bridge Co.*, 3 Wall. 51; *Mills* v. *St. Clair Co.*, 8 How. 569.    And this
rule is not confined to the grant of a corporate franchise, but it extends
to all grants of franchises or privileges by the state to individuals, in the
benefits of which the people at large cannot participate.    Cooley, Const.
Lim. 490, marg. p. 396.    The grant, then, of the Stein Water-Works is
not only to be construed strictly against the grantee, but it will not be
held to exclude the grant of a similar and competing privilege to the
Bienville Water-Supply Company, unless the terms of the grant to Stein
render such construction imperative.

Let us now apply these rules of construction to the agreement and con-
firmatory act under which Stein's claim is asserted.    The agreement is
declared to witness that the mayor, etc., (the corporate name of the city,)
in consideration of the covenants and agreements therein contained, etc.,
have granted, and by these presents do grant, unto Albert Stein, his heirs,
executors, etc., the privilege of supplying the city of Mobile with water
from the Three-Mile creek for 20 years from the date of the agreement,
as well as all the advantages and benefits which accrue to the said mayor,
etc., from, by, and under "'An act to incorporate an aqueduct company
in the city of Mobile,' passed December 20, 1820,    *    *    *    as well as

all the benefits and advantages which accrue to the said mayor, etc., by or under an act, etc., entitled 'An act to incorporate the Mobile Aqueduct Company,' passed December 25. 1837, * * * during and until the full end and term of twenty years next ensuing." Then comes the covenant on the part of the city that at the expiration of said term of 20 years it would pay to said Stein, etc., the actual value of his water-works, to be ascertained in a manner pointed out in the agreement. It is contended by complainant that the contract should be construed to accomplish the intention of the parties, and to ascertain that intention regard must be had to the nature of the instrument itself, and the object which they had in view; and if, by a fair construction given to the words used, either singly or in connection with the subject-matter, that intention can be clearly ascertained, effect should be given to it. And the contention is that the subject-matter and object of the contract was the supplying the city of Mobile with pure, wholesome water, and that the intention of the parties to the contract was to grant to Stein the "exclusive privilege and right" to conduct and bring water to the city of Mobile for the supplying of the inhabitants thereof, without restriction as to source. In the construction of contracts the cardinal rule, as has been stated, is to effectuate, if possible, the intention of the parties. The different clauses of a written contract should be construed together, and the intention gathered from the whole instrument, unless it is obvious that the parties intended otherwise. "Courts construing contracts look to the language, the subject-matter, and the circumstances, and avail themselves of the light the parties had when the contract was made, in order that they may view the circumstances as the parties viewed them, and so judge of the meaning of words, and their application to things described." 1 Kinney, (U. S.) Dig. p. 466, § 1, and authorities cited. The subject-matter of the agreement was the supplying of water to the city of Mobile, and while it is clear the primary object in view was to secure an adequate supply of pure, wholesome water, it seems to me equally clear from the language used in the contract, in view of the circumstances under which it was made, that the intention was to grant to Stein the sole privilege of supplying the city with water from the Three-Mile creek, and from no other source. Throughout the whole agreement the exclusive right granted Stein is thus described: "The sole privilege of supplying the city of Mobile with water from the Three-Mile creek." No other source seems to have been thought of. Certain it is no other stream or creek or source of supply is mentioned in the agreement, except that of the "Mobile City Water-Works," which it appears embraced ground at Spring Hill, near the Three-Mile creek, where the fountain was situated.

Another clause in the agreement is that Stein shall have power and authority to conduct the water from any part of the Three-Mile creek. This creek, as the source of supply, was distinctly agreed on, and specifically named. If the intention was to grant the sole privilege of supplying water from any and all sources, why use the qualifying words "from the Three-Mile creek?" There were several considerations which might have influenced the parties in restricting the grant to the sole privilege of bring-

ing the water from the Three-Mile creek, such as the location and accessibility of that stream; the quantity and quality of the water afforded by it; and the fact that the city was the owner of the "City Water-Works," embracing ground at Spring Hill, where the fountain was situated, and whence the city had been endeavoring for years to get its supply of water. Owing to the superior advantages of the Three-Mile creek as a source of water supply for the city of Mobile, the parties might reasonably have supposed that no attempt would be made to bring water from any other creek or stream to supply said city, at least for a period of 20 years. However this may be, by the plain language used in the contract it seems to me its meaning is free from ambiguity or doubt. My opinion, therefore, is that Stein's grant under the agreement of December 26, 1840, is of the sole privilege of supplying the city with water from the Three-Mile creek, and from no other source.

But it is contended by the complainant that the act of January 7, 1841, does not simply confirm the before-mentioned agreement, but that it grants and vests in Stein all the rights, powers, privileges, and immunities which were granted to the Mobile Aqueduct Company under the acts of the general assembly of the state of Alabama, passed December 20, 1820, and December 25, 1837. And he contends that under these acts Stein had the exclusive right and privilege of conducting and bringing water for the supply of said city, without restriction as to source. And it is claimed that if the intention was to restrict the franchise granted Stein to the use of water from the Three-Mile creek merely, there was no necessity to vest in him the rights, privileges, and immunities granted under the acts of 1820 and 1837. The act of 1841 vested in Stein such right, powers, privilege, and immunities as were granted by the acts of 1820 and 1837, so far as they were not inconsistent with the terms of the agreement of 1840; so far as they were inconsistent therewith he took nothing under them. If the acts of 1820 and 1837 granted the exclusive right and privilege of conducting and bringing water for the supply of said city from any and all sources for 40 years, as is contended by complainant, then the rights and privileges granted by said acts were inconsistent with the terms of the agreement, and were not, therefore, granted and vested in Stein by the act of 1841. As is said by one of the learned counsel in this case in an able brief submitted by him:

"Whatever rights are taken under the acts of 1820 and 1837 must be consistent with the grant under the agreement of 1840. If they are inconsistent, they cannot stand together. A sole privilege for forty years, from all sources, is a different thing from a sole privilege for twenty years from a definitely expressed source of supply."

And we have seen that Stein under the agreement had the exclusive or sole privilege to supply water from the Three-Mile creek, only, for a period of 20 years. It may be said that the necessity for vesting in Stein the rights, privileges, and immunities granted under the acts of 1820 and 1837 was to protect the property invested in the water-works under the provisions and penalties created under these acts, and the right to lay its pipes, and keep them in repair, in or under the public roads of

the county and streets of the city of Mobile, and to provide protection against injury and damage to the property, the rights, privileges, and immunities, as provided for by the acts of 1820 and 1837, were very necessary for the proper enjoyment of the privileges granted to Stein under the contract.

But do the acts of 1820 and 1837 grant an exclusive right to supply the city of Mobile with water from any and all sources? The act of 1837 authorized the formation of a corporation, and clothed it with the privileges conferred by the act of 1820 until the 1st day of December, 1856, and until they shall have been purchased out by the city of Mobile. It appears to have been purchased out in some manner prior to December, 1840, and it does not appear that the corporation ever did exercise the rights and privileges conferred on it. The act of 1820, in its preamble, recites, among other things, "that certain individuals have agreed to associate themselves together for the purpose of conducting a a supply of water from a creek called 'Three-Mile Creek,' for the use of the citizens and other persons residing in the city of Mobile." The first section of the act authorizes the formation of a corporation; the second section, the digging of canals, ditches, etc., and the third section provides that said corporation "shall have and enjoy the exclusive right and privilege of conducting and bringing water for the supply of said city for the space of forty years: provided, the said corporation shall, before the expiration of three years from the passage of the act, cause to be conducted the water from the said creek to the said city of Mobile in the manner hereinbefore proposed." The preamble of a statute is a key to it to open the minds of the makers as to the objects which are to be accomplished by the provisions of the statute. It is an explanation of what is to follow. Hence we construe the act in connection with the preamble, and, doing so, I can reach no other conclusion than that the intention of the legislature was to restrict the exclusive privilege of supplying the water to the Three-Mile creek. The condition or proviso in the third section clearly applies to the manner and time in which the water from the said creek should be conducted to the city. The state, in effect, says in the act:

"Whereas certain persons have agreed to associate themselves together for the purpose of conducting a supply of water from the Three-Mile creek, for the use of the citizens of Mobile, therefore they are authorized to form a corporation for that purpose, and they shall have the exclusive right to conduct and bring water for the supply of said citizens for the space of forty years: provided, they bring the water from the said creek within three years from the date of the act, and in the manner therein proposed."

"Nothing is better settled than that statutes creating monopolies, granting franchises and charters of incorporation, must be construed liberally in favor of the public and strictly against the grantee. Monopolies are justly regarded as encroachments upon the natural rights of the people, and are viewed with jealousy by courts." Sedg. Stat. Law, 339; *Gas-Light Co.* v. *City of Saginaw*, 28 Fed. Rep. 539. And the principle is, "that all rights which are asserted against the state must be clearly de-

fined. If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the state; and when it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the state." *Bridge Co.* v. *Bridge Co.*, 3 Wall. 51.

It is further contended by complainant that there was granted by the state to Stein the "exclusive privilege" to use the streets of Mobile for the purpose of laying pipes or conduits through which to bring water for the supply of the city, and that the privilege granted by the state to the defendant to lay pipes in the streets for the purpose of conveying water to said city is plainly in derogation of the state's grant to Stein; and the case of *Water-Works Co.* v. *Rivers*, 115 U. S. 682, 6 Sup. Ct. Rep. 273, is cited as one very much like this case; and the court is asked to compare the charter of that company with the acts granting Stein's franchise. On such comparison, and on an examination of that case, I find a wide distinction between it and this case. The language of the New Orleans Water-Works' charter is: "The exclusive privilege of supplying the city and inhabitants of New Orleans with water from the Mississippi river, or any other stream or river, by means of pipes and conduits on or over any of the lands or streets of New Orleans." Subsequently, under a legislative grant, Rivers proceeded to supply his premises (the St. Charles Hotel) with water from the Mississippi river, by means of pipes and conduits laid through the public streets of New Orleans, and the court held, in the case cited, that the grant to Rivers was plainly in derogation of the grant to the New Orleans Water-Works Company. There Rivers was proposing to bring the water from the Mississippi river, and by means of pipes on or through the streets of New Orleans, when the New Orleans Water-Works Company had the exclusive privilege to bring water from the same source, and by the same means. Here there is no complaint that defendant proposes to bring water from the Three-Mile creek, and here Stein has no exclusive privilege granted him to use the streets for his pipes. He had the exclusive right to bring water from the Three-Mile creek, and had the privilege granted him of using the streets free of charge for the purpose of laying down pipes for the conveyance of water. The language is:

"* * * Shall be permitted the use of the streets in the city of Mobile, free of charge, for the purpose of laying pipes for the conveyance of water, * * * and that the canal or ditch shall be conducted along any of the streets thereof."

And it is further claimed that if Stein's privilege only extends to supplying the city with water from the Three-Mile creek, and only through the works erected by him, still the right and privilege was secured to him without "let, molestation, or hinderance," and that the grant to the defendant is a molestation or hinderance to him in the full enjoyment of the privileges secured by his contract. The city contracted with Stein that he and his executors and assigns should have and retain quiet possession of the water-works for the term of 20 years, without let, molesta-

STEIN v. BIENVILLE WATER-SUPPLY CO.

tion, or hinderance of the city or its successors, or any person or persons claiming by or under them, and should have quiet possession of the same until the city or its successors shall redeem the said works. It does not appear from the record that the state, or the city of Mobile or its successors, or any person claiming under them, are now interfering with or propose to molest or hinder the complainant in the quiet possession of the said water-works. He still has the right to retain such possession, and to supply water from said works, to the citizens of Mobile, and this right will continue until the city of Mobile or its successors shall redeem the said works.

I am of opinion that Stein's exclusive right to supply the city of Mobile with water from the Three-Mile creek has long since expired, (expiring in December, 1860;) but the exclusive use of his water-works, and the exclusive right to supply water therefrom to the citizens of Mobile, remains to him.

If I am correct in the conclusions already reached in this case and herein announced, the point raised by the counsel for defendant, that the contracts under consideration are those in which the public health is involved, and may be modified or abrogated at the will of the legislature, is of no consequence, and need not now be decided. I will say, however, that I am now of the opinion that no question as to the exercise of the police power of the state arises in this controversy. The grant of the charter to the Bienville Water-Supply Company is not, as I view it, in any sense an exercise of the police power of the state. See *Gas-Light Co.* v. *Manufacturing Co.*, 115 U. S. R. 650, 6 Sup. Ct. Rep. 252, and authorities there cited.

My conclusion is that there is no equity in complainant's bill of complaint, and that all the demurrers thereto should be sustained except the sixth, seventh, eighth, ninth, and tenth, which are overruled.

### NOTE.

MONOPOLIES. A municipal corporation has no authority to create a monopoly unless expressly empowered by the legislature, Meadville Fuel Gas Co.'s Appeal, (Pa.) 4 Atl. Rep. 733; Saginaw G. L. Co. v. City of Saginaw, 28 Fed. Rep. 529; Jackson Co. H. R. Co. v. Interstate R. T. R. Co., 24 Fed. Rep. 306; New Orleans C. R. Co. v. Crescent City R. Co., 12 Fed. Rep. 308, and 5 Fed. Rep. 160; Davenport v. Kleinschmidt, (Mont.) 13 Pac. Rep. 249; Montjoy v. Pillow, (Miss.) 2 South. Rep. 108; City of Brenham v. Brenham Water Co., (Tex.) 4 S. W. Rep. 143; but it has been held that a municipality may delegate its police powers to persons and corporations, City of Louisville v. Weible, (Ky.) 1 S. W. Rep. 605.

Franchises relating to matters of which the public may assume control may be granted by the legislature, as a means of accomplishing public objects, to whomsoever and on what terms it pleases. So held as to the manufacture and distribution of gas, New Orleans Gas-Light Co. v. Louisiana Light, etc., Co., 6 Sup. Ct. Rep. 252; of the privilege of supplying a city with water, New Orleans Water-Works Co. v. Rivers, 6 Sup. Ct. Rep. 273. The grant of such exclusive privileges is a contract, the obligation of which cannot be impaired by subsequent legislation, except in so far as the protection of the public health, morals, or safety may be involved, New Orleans Water-Works Co. v. Rivers, *supra*; St. Tammany Water-Works Co. v. New Orleans Water-Works Co., 7 Sup. Ct. Rep. 405; Citizens' Water Co. of Bridgeport v. Bridgeport Hydraulic Co., (Conn.) 10 Atl. Rep. 170; People v. Squire, (N. Y.) 14 N. E. Rep. 820; New Orleans G. L. Co. v. Louisiana Light, etc., Co., *supra*; Saginaw G. L. Co. v. City of Saginaw, *supra*; City of Louisville v. Weible, (Ky.) 1 S. W. Rep. 605; as every charter granted is such a contract, State v. Morris & E. R. Co., (N. J.) 7 Atl. Rep. 826; Pennsylvania R. Co. v. Duncan, (Pa.) 5 Atl. Rep. 742, and note; Coast Line R. Co. v. City of Savannah, 30 Fed. Rep. 646; Tripp v. Pontiac & L. P. R. Co., (Mich.) 32 N. W. Rep. 907.